A preliminary matter. If I look at the empty chair, will I be making eye contact with Judge Nelson? Oh, he can see you just fine. OK. Very good. Good morning. May it please the Court. I'm Linda Ziskin, attorney for plaintiff appellant Alfred Brackenbury. Normally, when I prepare for oral argument, I want to be sure I can answer all the questions that you pose to me. In this case, if you ask me what happened on February 1, 2003, I will not be able to answer you. And the reason for that is that the ALJ does not tell us in his decision. Also, on January 1, 2001, which is the date of the initiation of the closed period of disability, there is no smoking gun piece of evidence that tells us that something happened that day where he became disabled as opposed to the alleged onset of disability date that he has filed for. Problem with this case is that the ALJ's decision is arbitrary. And he relied, apparently, on the testimony of the non-examining medical advisor at the hearing, who was Dr. Davis. It's evident when you read the transcript of that hearing that Judge Schloss only decided to grant the closed period after Dr. Davis testified. Before that, he was leaning toward not granting benefits. And you could tell by the tone of his questioning. Those of us who have appeared before him know that tone very well, which is not evidence in this case, of course. But at the end of the transcript, he does offer a closed period. This is only based on Dr. Davis's testimony. There's nothing else in the record that supports this closed period of two years. Well, I mean, in fairness, Dr. Kalaitis, who was an examining physician, saw him in September of 2003. And he said that Brackenberry's condition had improved and indicated pretty much he was able. He did not say he was not able to work.  So that is support for Davis's view. Jenkins, who examined Brackenberry in February of 2003, noted that he had stopped therapy and that he didn't find that he satisfied the requirements of the listing. So it wasn't just Davis. I mean, Davis's opinion was consistent with that of the examining physicians, more or less, in that time period. Well, with all due respect, I'm going to have to disagree that Dr. Kalaitis used the word improved. I didn't see that. I may have missed something. But what Dr. Kalaitis did say was that Mr. Brackenberry had a GAF, or a global assessment of functioning, of 45, which was moderate to severe symptoms. One of the definitions of that in the DSM-IV, which is a publication in the American Psychiatric Association, as we all know, is that you are unable to hold a job, you have difficulties with social functioning, and things of that nature. These are the characteristics and symptoms that Dr. Kalaitis identified. Both Dr. Kalaitis and, prior to the date of disability, the examination by Dr. Jenkins, both found the same exact GAF, and both found the same exact diagnosis of avoidant personality disorder, which was not discussed by the ALJ at all. And Dr. Davis did discuss this at the hearing, and what he said was that this avoidant personality disorder is a stable, ongoing, chronic condition. Doesn't go away. And that with the anxiety that comes with that disorder, his impairments are moderate to mark, which precludes employment. So the way I read this is that Dr. Kalaitis and Dr. Jenkins are completely in accord. Dr. Davis steps in as a non-examining doctor whose opinion is not worthy according to the case law in the circuit, Gallant, and also another case by the name of Winans, that say that his opinion, standing alone as it is, is not substantial evidence. So we have a decision that is not based upon substantial evidence by our own case law, and that's the way I read it. Also, another thing I want to point out is that Judge Mossman, I think this is harmless error, because if it's not substantial evidence, it doesn't matter. It's not a specific and legitimate standard to reject the other doctors, because standing alone, he doesn't count as the one who's contradicting the other doctors. So if you have two examining doctors, in this case we have no treating doctors' opinions, two examining doctors who are in accord, there is no contradiction, therefore, the standard must be clear and convincing. So it's not specific and legitimate. What I'm here to say today is that it's not even specific and legitimate because it wasn't substantial evidence. The whole case really turns on that. It turns on Dr. Davis' testimony. If you find that Dr. Davis, that there is medical improvement noted by one of the doctors who examined Mr. Brackenberry after the date of cessation of disability, I just don't see it. I don't see it in there. I see Dr. Kalilis telling us that he's had a gaffe of 45 for the whole year, which well predates that date of cessation. Again, I'm looking for a piece of evidence in this case that tells me, tells us what happened on that date, that he was no longer disabled. I cannot find it. I also cannot find evidence that on January 1st, 2001, all of a sudden he goes from years and years of not being disabled with the same symptoms, and then overnight he's disabled. He's disabled for two years and one month, and then he's not disabled again. It just doesn't ring true. It doesn't make sense. It doesn't smell right. I can't find the evidence. It's possible that if you remand, we can flesh this out and figure out what is it in Dr. Kalilis's opinion, or maybe recontact the doctor, as the ALJ should do anyway when there's any kind of a question or element of vagueness, which I don't even see here either. We could remand for that reason. I don't even think that's necessary. I want to point you to the vocational evaluation that was – it's called the Blankenship Vocational Evaluation, and I can get you that excerpt page site. That report in and of itself establishes his disability. I prefer you to find Mr. Breckenberry disabled at Step 3, of course, and still meeting the listing of 1204 or at least equaling it. Let's stop there. However, if we go on to Step 5, the Blankenship study found some things that would preclude all of the jobs that were identified for him at Step 5. And the Blankenship study, if you're looking for objective evidence, this is it. It's very objective. It was exhaustive testing, all sorts of testing. These are vocational professionals. They found he could not do fine manipulation, and they didn't even bother to test his ability to handle material – materials because it was so poor. He was off the charts. So he cannot – he also has a bad finger, which was mentioned in the medical evidence that the ALJ did not pick up on, but this was not brought out by the – by counsel at the hearing. Electronic assembler? I don't think so. And the other jobs were similar to that – electronic worker, wire bonder. You know, this is – these are jobs that are benchwork working with your hands, at least frequently, if not constantly. So the Blankenship study shows us that there's no way he can do these jobs. I don't think there's any need to remand this for further proceedings. I think there's no utility in that per the Harmon test. MR.  Can I ask you one question? MS. GARRETT. Sure. MR. CARRINGTON. Do you have a case law in the disability –  GARRETT. You know, interestingly – MR. CARRINGTON. – analysis? MS. GARRETT. It's not directly correlated to a finding of disability, but there is case law that says that a finding of 50 or less is supportive of disability. That case law exists in other circuits, and it would be wonderful to have a published decision in this circuit that tells us whether or not the gaffe is an indicator of disability. It's typically used that way, and –  CARRINGTON. What did the ALJ do here? MS. GARRETT. He ignored it. He – well, he ignored the import of it, let's say that. He asked Dr. Davis at the hearing about the gaffe, and Dr. Davis disagreed with it. But again, I'm – you know, Dr. Davis's opinion is not substantial evidence, so it doesn't really matter what he said at the hearing, as far as my perspective on this is concerned. The ALJ found that the gaffe – let me correct myself. He did ignore it. He did address it. And what he said was – CARRINGTON. So how are they – how should – under Ninth Circuit case law, how should they deal with the gaffe score? MS. GARRETT. I think it's persuasive evidence of disability. And unless we have case law, which we don't in this circuit, but it does exist in other for an indicator of disability, it's just going to be persuasive evidence. But it's highly persuasive because it comes from an authoritative source of experts. It's the American Psychiatric Association. I don't know why the agency bothers to send people out for these consultative examinations with this DSM-IV five-step analysis if they're going to ignore it or discount it. And interestingly, not in this case, but in many other cases where the gaffe is 65, the agency will rely on that as evidence of non-disability. So we can't have it both ways. That's disingenuous. And if you read the definition of 41 to 50 in the gaffe, it's – it does indicate that this is indicative of a person who cannot hold a job. So – Counsel, who was up here? I confused Mr. Brackenberry – I confused Mr. Brackenberry's case with Mr. Wakefield's case. He – No, there was testimony here about – I guess by his own testimony and by others that – regarding some of his physical – daily physical activities. Everything from what he did around the house to his – to his outside activities, one of which was shooting hoops. Shooting hoops. Probably badly. But we don't know that. Well, the LJ made note of that. He made note of it, and he asked a very interesting question at the hearing. He was almost testifying himself. He asked the medical advisor, what if we had someone who could play basketball for one to two hours a day, ride his bicycle five to six times a day, do all the household chores, go to the library, read books, discuss those books with other members of the family? What if we had such a person? And he then rightly said, well, then I would think that he would be only very mildly impaired. It would be, you know, very much improved. Well, that was a supposition on the ALJ's part, and none of those things were true that he said. He doesn't play basketball one to two hours a day. He used to play a little bit more. He has a shoulder problem. He shoots hoops once in a while. We don't know how well he does it. We can't surmise that he does it well, because that would not be substantial evidence. It would be speculation. He testified very clearly that he doesn't ride his bike anymore. He doesn't even have it, gave it to his nephew, and riding it caused him arm and shoulder pain. He did have a very serious neck operation, and we can't forget that. He had C8 radiculopathy and underwent surgery for that. So as we know, spinal surgeries are often not successful, and the residue of those surgeries is often continuing symptoms, and he shows this. It's a combination of impairments, if you want to go all the way to step five, that the limitations from that were not included in the vocational hypo, and in this same combination of impairments in step three really lead us toward a finding of equivalence, at the very least, if not meaninglessly. The other thing that's important to note is the B criteria of Listing 1204. The ALJ never went through that. He – I mean, you have to do that in a case when you have a major depression impairment. You have to tell us whether, you know, there are marked, mild, moderate impairments. But he had the amigo through it, didn't he? I'm sorry to hear you. He had the medical – the testifying doctor. The medical examiner just repeated what Dr. Kalilis found, which was – or was it – it may have been also Jenkins that opined that without anxiety, he's going to be mild to moderate, and with anxiety, he's going to be marked – he's going to be moderate to marked in many areas which preclude employment. Question is, how do we know when he's going to be anxious, when he's not? And one of the things that Dr. Davis said that I found very interesting was that he noted the avoidant personality disorder diagnosis rendered by both Kalilis and Jenkins. And he said, this is a stable, ongoing condition that you have. It's a personality disorder. It doesn't go away. He did then clarify that or qualify that by saying, well, if he didn't have the anxiety, then I think he could do some work. But it was pretty clear that any kind of job with a bunch of other people was not going to work for Mr. Brackenberry. And that's – that's, you know, in the Blankenship study and in all the opinions by the voc rehab people, they all say the same thing. He's a very unfortunate individual. This is a guy that lives at home, is abused by – verbally abused by his father, was in and out of foster homes as a child, lived in his car in a rest stop. And one of the opinions was that, you know, it doesn't appear that this fellow is going to be able to take care of himself on a daily basis. So those activities of daily living, he said he doesn't make his bed, he occasionally helps with vacuuming and dusting, he can maybe cook oatmeal and hamburgers, but he doesn't do the cooking. There's no support for A.L.J. Schloss's supposition that this man can do his activities of daily living. He showers once a week, you know, maybe he shaves every three days. He's, you know, not really able to lead a normal life. And I think if you really thoughtfully read this record, that strikes you. It struck me in this case very much. I see I do have some time remaining. We had an extra bit of time here today. I appreciate that. I'd like to reserve my time. Surely. Thank you. Ms. Martz? Good morning. What struck me listening to Appellant's presentation was the statement of the personality disorder that has existed probably most of his life. And he worked during periods of his life. So this personality disorder in and of itself doesn't necessarily preclude work. And the evidence in this case, and I disagree with Appellant, there is evidence to link to the A.L.J.'s two-year period of disability. And it is really driven by the depression. And the first evidence in the record of any depression doesn't come in until January of 2001, which is what is the first date of that period of disability. And it's at that time that Dr. Maxim and Dr. Croson diagnosed a major depressive disorder. The next incident of any evidence of continued depression doesn't occur until 2002 in May when he begins treatment with the Cascadia Counseling Services. And at that point in time, he's seen at intake, and he's noted in May of 2000 to be appearing to be quite depressed. In July of 2002, his therapist says that he's severely distressed to an alarming level. He has various impaired activities of daily living, and particularly with social functioning, an impaired concentration. However, by October of 2002, the therapist notes, indicate that a psychologist, Stephen Berry, and this is at the excerpts of records, page 586, questioned the level of severity based on the Appellant's described several meaningful activities. The treatment was terminated in December of 2002 after a missed appointment. The note on excerpts of records, page 577, noted that he was stable on medications, that he didn't appear to have any further goals to pursue in counseling, and he's referred to his treating doctor for medications. There was a prognosis also listed in that. Based on the information received from the psychological assessment, client participated in therapy, presuming there seems to be a word missing, as part of an attempt to be approved for GA, general assistance. Client's behaviors of watching sports, reading the newspaper daily, and turning down jobs that conflicted with weekend games were not congruent with his suffering from severe depression. This is at the end of 2002. This evidence, along with the medical expert's testimony, does give something to hook onto that the ALJ needed to say that he was disabled from January of 2001, and giving him the benefit of the doubt through January of 2003. It's at this point that the medical evidence from the consultative examiners come in, and I disagree with Appellant that those, I believe that those examining reports are consistent with the medical expert's testimony, in which each of these reports indicates is that his problems are driven by his social anxiety, and his anxiety is triggered, rather, by his social interaction. The more social interactions he's required to have, the more anxiety he has, and the more that impacts his functioning. If you lessen the social interactions, there's less anxiety, there's better functioning. And that's essentially what the medical expert testified to. That's consistent with both of the reports. And that's the evidence that the ALJ's decision was based on. Regarding the GAF scores that were discussed in Appellant's presentation, to say that a disability is a tricky thing, because, first of all, a GAF score can be based on symptoms, or it can be based on functioning. And disability is based on the constellation of your medical impairments and the symptoms and how that impacts your functioning. So a GAF score, in and of itself, could be symptoms and not functioning, which is why the commissioner stated, in evaluating the listings, that we don't use, the commissioner doesn't use a GAF score to say that this is a certain level of severity, just because it's too unclear what a psychologist may be basing that assessment on. Further, to say that a GAF score, in this case of 45, shows an equaling or a meeting of a listing, makes Dr. Kalilis' report internally inconsistent. Because, on the one hand, he states in his report that he is mentally capable of understanding, at least following simple one or two-step instructions. He would work best in a job where he's not around many people. Essentially his statement on employability was that Mr. Brackenberry could work. And if you juxtapose that to the GAF score of 45, then you have an inconsistency. Let me just zero in on what kind of bothered me about this case. So the ALJ, in his decision, is talking about Dr. Jenkins' report in the paragraph. And at the end of that paragraph, he says, Dr. Jenkins diagnosed depressive disorder, avoidant personality disorder, BIF, provisional, and assessed a GAF of 45. He did not assess the claimant's limitations, unlike Dr. Kalilis did in his report. And then he has this, the next statement by the ALJ is, this report suggests that the claimant's condition had substantially improved by February 2003, consistent with the testimony of the medical expert. Now, when I went back and read Dr. Jenkins' report, I couldn't quite figure out how the ALJ arrived at that decision that he had substantially improved. I couldn't read Dr. Jenkins. I looked at, and I would ask you to help, if you could point to me in Dr. Jenkins' report where something in Dr. Jenkins' report that would support the ALJ statement there. And then the ALJ goes on to say, that is reasonable, but it does not support a GAF of 45. And I couldn't quite figure out, what's the basis for the ALJ to say that that supports, does not support a GAF of 45? There's no explanation. I believe the explanation is in the medical expert's testimony. I would agree with you that the ALJ didn't link all of those things together, but it really comes back to the medical expert's testimony. The report from Dr. Jenkins didn't assess limitations, but he did note that Mr. Brackenberry was cooperative, that rapport was easily established during the examination. He described his memory as fair. Concentration was adequate. There was a long history of shyness and avoidance of social interactions noted, but again, he looks like that has been a lifelong thing, just like his borderline intellectual functioning, which didn't preclude work in previous periods. And it's really this depression. So from all of that, you derive that he's substantially improved? If I had to point to any evidence in Dr. Jenkins' report, that's the evidence that's there. But again, I think if you put it into context with the medical expert's testimony, as well as the September report from Dr. Koulilas, it does give you more of an overall picture. Regarding the vocational rehabilitation counselor's report, the items that were in that report, as far as the limitations that were assessed, those limitations were based upon the claimant's self-assessment. So it wasn't necessarily an objective test. It states in the report itself that the limitations described are based on the self-estimate of Mr. Brackenberry, and that's the excerpts of record at 194 to 195. Notably, the vocational rehabilitation services was closed in September of 2001, after they had referred him out to Goodwill, noting that he was, which they believed to be, so physically limited, again, based on his self-assessment, as well as what he was willing to do. And when they had tried to send him to it for a job interview with Goodwill Industries in June of 2000, Mr. Brackenberry indicated he was willing to work at all hours and days, but yet when he got to the interview, he said he couldn't get up early on weekends, and that because he might wake up others in the household, and he didn't want to work weekends because it would interfere with him watching sports, and that's at the excerpts of records 282. And even the vocational counselors at that point in 2000, and this is, again, during a period of non-disability, questioned his motivation to work. As far as the physical evidence shows, he did have this injury in April of 1998, a workplace injury in the neck and shoulder, but there is evidence from the treating surgeon by September of 1998 that he was returned to work, with a restriction initially to 50 pounds, and that's at excerpts 361, and in November, the treating doctor said he could return to work and with no more lifting of 30 pounds. If there are no additional questions, I think it's going to be all. I don't think so. Thank you. Thank you. Okay, Ms. Isken? Judge Paez, you put your finger on it when you asked my colleague about Dr. Jenkins' diagnosis. No, there isn't anything there. What she identified may be there, but unfortunately, the ALJ didn't identify it, and I did not cite this case in this brief, but as I, when I was here testifying two days ago, I mentioned a case called SEC v. Chenery, and there's a bedrock principle of administrative law that applies to what my colleague here has said to you today, which is that counsel for the agency's post hoc rationalizations do not constitute evidence, and the court cannot accept this. It's the ALJ that must explain his reasoning, and he didn't do it here, as was admitted. Another point I'd like to address is about the vocational rehab limitations. Correctly, defendants' counsel has identified this as being a self-assessment, but that's not the one I was talking about. I was talking about the Blankenship Study, which is objective evidence, and you can find that at Excerpts of Record 410. Okay, that's the one that talks about his ability to handle and his just, you know, really low scores in most of the vocational parameters that are necessary to sustain employment. That is objective. The vocational rehab, based on self-assessment, yes, but these are also vocational professionals who go through, you know, many, many sessions with him, so. But he did the statement that counsel just raised to us that he didn't want to work on the, he was unable to or didn't want to or was not desirous of working on the weekends. First, let's consider the source. You know, we all agree with that. But Judge Pius, consider the source. Mr. Brackenberry has, he's either mildly mentally retarded or, at best, borderline intellectual functioning. And he did explain at the hearing, counsel did want to address that because that was kind of a bad thing to say. And he said, well, I just said it because I knew I wouldn't be able to do that kind of work anyway. So this is not a man who has great insight or great judgment and sometimes says things that, you know, aren't in his best interest. And, you know, he said that. I don't have any quarrel with that. I think you need to look at the totality of the rest of this evidence, though. That's a fairly minor thing. I think with his neck problems, which are objectively verified through his surgeries, and all the rest of his problems, you know, I think it's kind of common sense. It's kind of like a basketball thing. The other point that defendants' counsel made was that back when he was diagnosed with depression, he was working. This was, like, in the 80s. I believe it was 87 and 97. I'd have to check that. But part of that is well before his AOD. So maybe he did work. And he was also doing work that he enjoyed that maybe relieved some of his impression. And this was physical labor. He was working at a nursery and he enjoyed working with the plants and the trees. He can no longer do that. So that's not really on point. The defendant cited a lot of evidence supporting the ALJ's finding. And she very well may be correct, but the ALJ didn't do it. That's the problem here. This is a really flawed, technically flawed decision. And I believe it has to go back, if not for an outright award of benefits, because I think it's pretty clear with this voluminous record what's going on in this man's life, but at least to clarify this and write a technically correct decision that is based on substantial evidence. And that's my main complaint with this case. It's arbitrary. Okay. Thank you very much. Counsel, both of you and that have just argued and will be submitted. We'll next hear argument in Van Lee v. Latest Technologies.
judges: Rymer, Nelson, Paez